NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0253n.06

Case Nos. 20-5891/5897/5920/5946/6010

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 23, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| JAYSON MONTGOMERY, et al., | ) | |
| | ) | |
| Defendants-Appellants. | ) | OPINION |
| | ) | |

Before: McKEAGUE, STRANCH, and BUSH, Circuit Judges.

**McKEAGUE, Circuit Judge.** This case is about a get-rich-quick pyramid scheme. Five defendant drug marketers extracted $35 million in two years from public and private insurers by convincing friends and family to order prescription creams and wellness tablets that they didn't need, and then pocketing a cut of the insurance reimbursement for themselves. The government caught on, and the defendants were charged with and convicted of various counts of healthcare fraud, conspiracy to commit healthcare fraud, wire fraud, mail fraud, paying and receiving illegal kickbacks, and money laundering. Despite carefully targeting insurance companies that would reimburse without scrutiny, hiring a nurse practitioner to sign prescriptions without asking questions, inducing people to order creams by giving them a cut of the commission, and charging insurance companies thousands of dollars for creams with ingredients that could be purchased over the counter for a fraction of the price, the defendants claim that their convictions should be vacated

because of their belief that all of this was perfectly legal. In the alternative, they argue that even if what they did was fraudulent, they should not be held accountable at sentencing for the total loss because at least some prescriptions were legitimate, though they don't identify which ones or explain why.

Because a rational factfinder could infer intent to defraud from the defendants' actions, and because the defendants did not establish the legitimacy of any part of their operation, we affirm the convictions and sentences of all defendants.

## I.

### A.

The scheme perpetrated here was built to exploit a prescription drug insurance system dependent upon intermediary gatekeepers. Generally, health insurance pays for prescription medications needed by those covered under their plans. Typically, a patient meets with their doctor, the doctor assesses their medical needs, and the doctor prescribes medication if necessary. The doctor then sends that prescription to a pharmacy, and the pharmacy fills the prescription. The patient often pays a co-payment when picking up the prescription. The pharmacy then submits a reimbursement claim for the remaining cost to the insurer through an intermediary called a pharmacy benefit manager. Reimbursements are often approved automatically, although expensive or uncommon medications may require preauthorization.

Before the passage of the Affordable Care Act, insurers reimbursed pharmacies for only one ingredient per prescription to keep costs down. Compound drugs—drugs with multiple ingredients that are prescribed when a standard medication can't meet a patient's specialized medical needs—often required preauthorization. After the passage of the Act, some insurers changed their coverage to include reimbursement for compound medications without

preauthorization. One of those insurers was Tricare, a health benefit program for military personnel.

**B.**

With some insurers adapting their coverage to reimburse for compound medications without prior scrutiny, the defendants saw an opportunity. At the front end, they negotiated agreements with several pharmacies to receive a 30–40% cut of the insurance reimbursement for compound drugs they marketed. Then they paid a pharmacist, Jared Schwab, to help them devise compound drug formulas that used the most expensive ingredients to maximize their reimbursement. They took those pre-set formulas and made pre-printed pads of order forms—even though compound drugs are meant to be tailored to a patient's individual needs.

In the next stage, they identified family, friends, coworkers, and military service members whom they knew had insurance that would reimburse for compound medications without preauthorization and encouraged those people to order compound creams and pills whether or not they needed or wanted them. They did so primarily by offering to pay customers. The defendants told customers that they were being paid for evaluating the creams as part of a clinical trial. But no clinical trial or survey about the products was ever conducted. And there is no evidence that the defendants planned or intended to conduct a survey. Any such clinical trial would have required approval by the insurance company prior to any benefits being paid. The defendants also persuaded people to order creams they didn't need by assuring them that they would pay nothing for the medications, and then ensuring that outcome by either paying co-pays for them or seeking waivers. To increase their sales, the defendants added medications to customers' order forms that they did not request and sought refills for customers without their consent.

Once the prescription order forms were completed, they gave them to a nurse practitioner, Candace Michele Craven. The defendants paid Craven to sign prescriptions without evaluating patients, or they simply stamped her signature without her knowledge. Then they faxed the prescriptions to the pharmacies, who in turn sought reimbursement from the insurers. The compound medications were very expensive, ranging from $4,000 to $15,000 per cream. Some customers' insurance providers were billed hundreds of thousands of dollars for the unnecessary medications. When the defendants received their commissions from the pharmacies, they gave a cut of those commissions to the lower-level marketers whom they had recruited to sell the creams on their behalf. In total, the scheme extracted approximately $35 million from government and private insurers.

## C.

Jerry Wayne Wilkerson was at the top of the pyramid scheme. He negotiated with the compounding pharmacies to be paid a 30–40% commission of the insurance reimbursement for each prescription they marketed. On the next step down were Wilkerson's recruits: Michael Chatfield, Billy Hindmon, and Kasey Nicholson, whom Wilkerson in turn paid approximately half of the commission he received. On the next step was Hindmon's recruit, Jayson Montgomery, whom Hindmon paid approximately half of his commissions. The group set up LLCs to receive the commission payments and make the enterprise appear legitimate. Each of the defendants recruited their own subordinate marketers, referred to as "downlinks," by offering them a cut of their commissions. The defendants advised and helped downlinks set up LLCs to receive the commissions via wire transfer.

**D.**

Jerry Wayne Wilkerson

As the instigator and leader of the scheme, Wilkerson negotiated the commission arrangement with the pharmacies. He set up Top Tier, LLC to receive the commission and paid his downlinks via wire transfer from Top Tier. Working with his downlinks, he identified insurers covering compound medications and targeted customers who had such insurance. In an email to Chatfield, Hindmon, Nicholson, and others, Wilkerson shared the news that Tricare would continue paying for compound medication and wrote, "It's money making time. Saddle up." R. 374, P. 6190–91.

Wilkerson paid Schwab, the pharmacist, to consult on creating a pre-printed prescription pad with pre-set formulas for the compound creams. They chose the formulas by "put[ting] the most expensive ingredients in the medication[,]" rather than by considering medical efficacy. R. 313, P. 2750–51.

Wilkerson also paid Craven, the nurse practitioner, to sign prescriptions without evaluating patients. Craven was working at a facility called Balanced Life at the time and was not Wilkerson's employee when he began paying her for these services. Wilkerson eventually hired Craven to work at the spa he opened, Karma Wellness. Craven estimated that she signed prescriptions without seeing patients on ten occasions; writing multiple prescriptions each time. Wilkerson instructed his downlinks to make a stamp with Craven's signature and directed employees to stamp prescriptions without her consent. When Craven confronted him about this, Wilkerson said, "It's okay. Everything's under control." R. 313, P. 2804. Craven testified that it was not typical practice for a medical provider to prescribe medications for patients referred directly by marketers, and this arrangement was the only time she had done so.

Hunter Magnuson worked the front desk at Balanced Life when Wilkerson established his arrangement with Craven. Although he didn't work there, Wilkerson frequently visited Balanced Life to speak with Craven. After the visits, he left stacks of prescriptions with Magnuson to be faxed to the pharmacy. Magnuson remembers faxing stacks of prescriptions that were an inch to an inch-and-a-half thick on multiple occasions. Sometimes Wilkerson brought stamped prescriptions to Magnuson to be faxed without visiting with Craven first.

Heather Fryar worked the front desk at Karma Wellness, owned by Wilkerson. While she was working there, Wilkerson discussed the nonexistent clinical trial. He directed Fryar to stamp Craven's signature on a stack of prescriptions, and when she asked why, he said it was her "job" to do so. R. 361, P. 4639–40. Fryar also marketed creams as a downlink, earning $33,000 in commission for sales she made to one person in just half an hour.

Wilkerson's downlinks included Rich and Kim Terry, Wilkerson's cousin, and his wife. Together, Rich and Kim Terry received over $120,000 in commission from Wilkerson for creams they ordered for themselves and creams they sold to family members and co-workers. Just before receiving a $93,649 payment from Wilkerson, Rich Terry opened a bank account under the name "Terry Transport." The Terrys paid a cut of those commissions to the relatives and friends who were their customers. Dawn Steele, who ordered creams from the Terrys, testified that she did not need the creams and simply ordered them to "help [Wilkerson] get his company going." R. 361, P. 4328. Her husband, Nelson Steele, believed that they were being compensated because they would be participating in the clinical trial. Although Craven signed the prescriptions, Nelson never spoke to her about the medications before receiving them. The Steeles were signed up for refills of the medications without requesting them.

Another of Wilkerson's downlinks was a longtime friend and retired Marine, Josh Linz (also downlinked from Hindmon). Wilkerson advised him to open an LLC, and he did so under the name AFA Consulting. His purpose in establishing the LLC was "to receive payment for [him]self for the topical creams." R. 369, P. 5710–11. In total, he received approximately $99,000 for ordering his own creams, and selling creams to his roommate.

Wilkerson opened an LLC for one of his downlinks, Amanda Booker. Although Wilkerson set it up, the name of the LLC was Booker's initials. He told her that she "had to have an LLC to receive the wire transfers." R. 370, P. 5813.

When one of Chatfield's downlinks, Ryan McGowan, found out he had a co-pay on the medications, Chatfield assured him that "Wayne" "would pay it." R. 370, P. 5911–12. Wilkerson met McGowan in a post office parking lot and gave him $2,000 cash; McGowan took the money inside, purchased money orders, and mailed the co-pays to the pharmacy.

In text messages with Kirtis Green (who was prosecuted in a separate case for his involvement), Wilkerson said, "We will just set up an online fax account and feed scripts to Michelle [Craven] constantly," to which Green responded, "Perfect. She said she will sign 500 a time once Karma opens." R. 375, P. 6444. Two days later Wilkerson texted Green again: "Hey forgot about what I had to pay for Michelle [Craven] and Jared [Schwab] and I am splitting that up between me, you, and Beaver [Chatfield] . . . [s]o it's 4k apiece. We can settle that up in Florida." R. 375, P. 6445. Wilkerson later deducted $4,000 from the May commission checks he paid to Green, Chatfield, Hindmon, and Nicholson. On June 3, 2014, just days after Blue Cross Blue Shield of Tennessee stopped covering compound medications without preauthorization, Wilkerson texted Green and said, "Talked to Jared. He's gonna . . . backdate the scripts from yesterday and Christi added some refills to May." R. 375, P. 6446. A few months later, Wilkerson

texted Green asking for a map of military bases for marketing to those with Tricare insurance, and Green responded with a map and said, "[a]ll I see is $$$," to which Wilkerson replied, "Damn straight." R. 375, P. 6446.

Wilkerson earned $13 million from the approximately two-year enterprise.

Michael Chatfield

Chatfield worked directly under Wilkerson. His family business, Diversified Printing, printed the pre-set compound formula prescription pads the marketers used. He also acquired the stamp of Craven's signature. Craven and Schwab were paid out of funds from Chatfield's commission.

Chatfield recruited his own customers and downlinks. When recruiting downlinks, he informed them that the "process" of selling these creams involved telling people that they would be paid for "[t]heir participation in a survey regarding the creams." R. 368, P. 5292. His customers included his aunt, uncle, and cousin. His uncle testified that he had no need for the creams, and he couldn't recall speaking to a medical provider before ordering the creams. Chatfield gave his uncle a $6,200 check, which seemed strange to him because he hadn't done anything.

Chatfield also sold the medications to friends of his brother, the Bowling family. He pitched the sale to them as a "business opportunity, which was filling out this form with [their] insurance information, and that it was basically kind of like a survey type thing where [they] would get some creams to try, and [they] would be sent a survey, then [they] would be paid for that survey." R. 361, P. 4446–47. Chatfield said that "if [they] signed up more people in [their] family that [they] would receive a larger sum of money." R. 361, P. 4453–54. The Bowlings ordered creams for other family members as well and testified later that they did not need the creams, did not request the creams, and did not speak to a medical provider before receiving them. Emma

Bowling testified that she received scar, wound, antiaging, wrinkle, and stretch mark creams even though she was a teenager with no need for those creams and had not requested them.

Chatfield also ordered medications in the names of his wife's parents without them requesting the medications or giving him permission to do so. In fact, his wife's parents never spoke to Craven about the creams. The creams were shipped to Chatfield's address and the order listed his wife's phone number.

One of Chatfield's downlinks was former Marine Josh Morgan. Chatfield promised Morgan $300 for ordering creams for himself and told him to offer the same deal to fellow Marines to get them to order creams. Morgan testified that the purpose of the fabricated clinical trial was "[b]asically, to get [customers] to sign up for the cream." R. 369, P. 5649. Chatfield told Morgan not to bother with people who didn't have Tricare insurance. He also told Morgan to form an LLC to receive the commissions Chatfield was paying him. Morgan received $314,000 from Chatfield despite never meeting him in person.

Another of Chatfield's downlinks was George Striker. Chatfield advised Striker that his "role would be to approach people, to ask them to sign up for these creams, to participate in a study, and that they would be paid $100 per person that signed up." R. 368, P. 5283. He said that those ordering creams "wouldn't have to pay anything out of pocket." R. 368, P. 5284. Striker ordered creams for himself, his wife, daughter, stepchildren, ex-wife, father, uncle, cousins, and cousins' kids. Like the others, Striker repeatedly cut corners. Striker's stepdaughter, for example, never spoke to a medical provider. Instead, Chatfield joked that "every kid has scars from growing up and things like that, so, [they] just added the scar cream" to the stepdaughter's order. R. 368, P. 5305. Chatfield informed Striker that they could not order a medication with fluticasone in it because of his stepson's age, so they "put him down for something else." R. 368, P. 5307–08.

Striker testified that he understood the purpose for ordering the creams was "Commission. Revenue." R. 331, P. 3413.

In a series of text messages between Chatfield and Striker, the two discussed how much each family member's orders would net and which medications would bring the highest returns. For example, one text said that the "wound creams" could get them "17 to 20k." R. 368, P. 5313–14. He told Striker that he "made 17k total for August and as long as you don't lose anyone and refills keep going through . . . you're over 21k." R. 368, P. 5335. Chatfield also texted Striker that "at least we got Hamby to get his wound and wellness come Monday that's 20k in revenue." R. 368, P. 5337–38. Chatfield asked Striker if the "Walter family [would] be okay with wellness tablets?" and when he said they would, Chatfield responded, "[s]end all four of them wellness tablets. 25k in revenue extra." R. 368, P. 5343. Chatfield explained that Striker would be getting "a total of 40–42k revenue from your family at Central [pharmacy]." R. 368, P. 5349–50.

When the cream scheme came under investigation, Striker surreptitiously recorded a February 10, 2015, phone conversation between himself, Chatfield, and another marketer, regarding what to say if contacted by law enforcement. In that call, they discussed why there was no clinical trial or survey in place although they had been telling people they were being paid for evaluating the products. Chatfield said they could tell customers, "[H]ey, we got an approved evaluation now. Go back and fill it out" because they "would have to cover [their] butt to have them do an evaluation after the fact." R. 368, P. 5388, 5399. Striker told Chatfield that the agent asked who referred him for the creams, and Chatfield said, "[S]ay someone from work told you. Say I can't remember. Say one of my customers told me. It's been months ago. I don't remember." R. 368, P. 5391. When they discussed reimbursing customers for co-pays, Chatfield said, "That's not—that's not how you word it though." R. 368, P. 5396. Insurers were billed for

over $7.6 million for prescriptions sold by Chatfield through Striker. In the conversation, Chatfield referred to activity happening at the Willow pharmacy—the pharmacy where their consultant Jared Schwab was employed—as "fraud." R. 368, P. 5392.

In a series of text messages with Kirtis Green, Chatfield said, "I'm having 16 script pads made up of the Karma Wellness Spa with the corrections that Jared told me to make. That includes giving .05 Fluticasone to antiaging and age spots . . . . I figured that would be the best way to make money and we can ignore Billy's dermatologist, if she doesn't want Fluticasone, we will give her her own pad." R. 375, P. 6420–21. He went on to say that "if antiaging bills out [$]2,000 and age spots [$]2500 or [$]7,000, I'll take the second all day . . . . It was billing out [$]4800 with .025 then when Billy changed it, it went down to [$]2000[,] now Jared said to go to .05 so it should be around [$]7,000. I have too many people getting those creams for them to be billing out at [$]2,000." R. 375, P. 6422. When Green asked Chatfield what the insurers would be billed for the creams, he said, "Stretch [$]10, Scar [$]11, Wound [$]12–14, Acne–[$]6500, Psoriasis [$]5500, Wrinkle and age spots [$]4800." R. 375, P. 6437. He said that "[w]ellness is [$]6K," and "antifungal is [$]13 and eczema is [$]10." R. 375, P. 6404. Chatfield joked about adjusting the formula on the prescription pads to 10 percent fluticasone which would make the cream cost $60,000. In discussing one of the creams, Chatfield said, "One of my patient's kids got a burn from it. Luckily I knew him." Green responded, "[g]otcha. LOL. No more [$]8K haha," and Chatfield said, "nope, even Jared admitted he shouldn't have done that." R. 375, P. 6402.

When Blue Cross Blue Shield insurance set a June 2, 2014, deadline to stop covering compound medications, Chatfield texted Green about backdating prescriptions saying, "[d]o you see all of those refills they are doing 10 days early for our Blue Cross Blue Shield people LOL . . . . Yeah. Jared said he was going to put lost or stolen and override LOL." R. 375, P. 6426–27.

- 11 -

Around the same timeframe, Chatfield also asked Green, "[a]ny word from our e-mails and refills?" and Green said, "[y]es, both are solid. Jared is backdating and fixing today." R. 375, P. 6434.

In February 2015, because the scheme was being investigated, Chatfield sold his "book of business" to Jimmy Collins for $1.5 million. Overall, Chatfield earned approximately $5.4 million from the scheme.

Billy Hindmon

Hindmon worked directly under Wilkerson, and he, too, recruited customers and downlinks, including Jayson Montgomery. Hindmon started out trying to market to doctors, but soon began marketing directly to patients because Wilkerson had "a nurse on staff" who would sign prescriptions, allowing them to "bypass the gatekeeper so to speak." R. 360, P. 4079, 4081. Wilkerson withheld $4,000 from Hindmon's commission check to cover payments to Craven and Schwab.

Hindmon also recruited Adam Staten as a downlink, advised him to form an LLC, and helped him do so. He sent Staten a "consent form" that stated marketers would not receive commissions for sales to customers whose insurance did not cover compound medications and those customers would not receive their "participation compensation." R. 360, P. 4136–38. Hindmon knew Staten was paying his customers, numbering at least twenty, to order creams and loaned him money on at least one occasion to do so. Both Hindmon and Staten told customers they would be paid as part of a clinical trial. And when customers complained about not being paid for their participation in the trial, Hindmon paid them. Hindmon and Staten tried to recruit additional nurse practitioners to join the scheme.

One of Staten's customers was Rachel Franklin, who ordered scar cream; Staten added eczema, stretch mark, wart, and wound creams to her order as well, although she hadn't requested them and was never contacted by a medical provider. Franklin contacted Staten crying because her healthcare savings account had been depleted from cream orders. Staten called Hindmon who assured him that he would "get it fixed." R. 360, P. 4128–29. Franklin called Hindmon directly, and Hindmon said he would pay her in cash if he couldn't get it taken care of.

Hindmon earned over $1 million from the scheme.

<u>Kasey Nicholson</u>

Nicholson worked directly under Wilkerson and was also his girlfriend. Her commission money was used to pay Craven and Schwab. But Nicholson also recruited her own customers and downlinks. Heather Fryar testified that, like the others, Nicholson was encouraging customers to order creams by telling them they'd be paid as part of a (nonexistent) clinical trial. One of her customers was her close friend, Sydney Patterson. Nicholson offered Patterson part of her commission to order creams. Patterson didn't want to order refills because she "didn't think they worked," but Nicholson persuaded her to order more before the June 2, 2014, Blue Cross Blue Shield deadline. R. 313, P. 2764–66. Nicholson's payments to Patterson included $1,000 that she used to go to a music festival and a $1,000 "birthday" check.

Nicholson also recruited Navy sailor Matthew Perkins as a downlink. Nicholson contacted Perkins to see if he wanted "to sign up for the medication to get money." R. 313, P. 2672, 2680. They discussed how "they just put the most expensive ingredients in the medication" to make more money. R. 313, P. 2750–51. She told him how she "paid somebody's insurance for the year and gave them $10,000 in cash because she would make that money back" in two months' commission. R. 313, P. 2719. Perkins ordered wellness pills, scar cream, stretch mark cream, and pain cream

for himself and for his wife. Perkins was unaware of the cost of the medications until he received his Explanation of Benefits (EOB) from his insurer, which showed that Tricare was billed $67,000 for his medications in December alone, and an additional $60,000 for his wife's creams that month. Upset, he called Nicholson, and she assured him, "that's how much the insurance company pays for the creams, that it's not a big deal." R. 313, P. 2700. Perkins's EOB showed that Tricare paid $6,038.20 for the wellness pills alone, and the defendants' expert agreed that the ingredients in those pills could be purchased at Walmart for "[$]10 to $20, $30 each." R. 380, P. 7544–45.

Nicholson informed Perkins that she would pay him $4,000 to $5,000 for each person he could get to sign up to order compound medications, but she later lowered the commission to $1,000. Perkins recruited approximately 30 fellow shipmates to order creams by paying them or taking them out for drinks. Nicholson instructed Perkins to "do whatever [he] ha[s] to do to get people to sign up" for the creams and encouraged him to sell the creams that garnered the highest reimbursement. R. 313, P. 2678, 2742. She advised Perkins to set up an LLC because "the bank wires were going to be so large and [he] was banking with Navy Federal, so it just wouldn't look good." R. 313, P. 2703. Nicholson paid Perkins approximately $40,000 a month for several months. When the scheme came under investigation, Nicholson contacted Perkins via Snapchat and told him not to speak to law enforcement. Perkins testified that he thought things were legal in the beginning, but later knew it was a fraud.

Nicholson earned nearly $1 million from the scheme.

Jayson Montgomery

Montgomery was a downlink of Hindmon. His commission money was used to pay Craven and Schwab. His first customer and downlink of his own was his mother, Dawn Montgomery. She testified that Jayson knew she had Blue Cross Blue Shield insurance that covered compound

medications. He told her that she would be paid $200–$300 for each cream she ordered and that she would not have to pay any co-pays. He also told her that she would be paid $100 for every person she signed up to order creams. She ordered creams for herself and her grandchildren. She was never contacted by a medical professional until she was asked if she wanted to refill her prescriptions. Jayson paid her the commissions.

Dawn sold the creams to her supervisor, Maria Valdez, telling her that she would get $100 per order. Valdez ordered creams for herself and six of her family members. She was never contacted by a doctor before receiving the medications. When Valdez received bills for co-pays and complained, Dawn contacted Jayson, who went with Hindmon to get money orders and came to their workplace to pay Valdez back. When Valdez complained that she also had not received her $100 per order that she was promised, Hindmon paid her $700 cash on the spot. Valdez's insurance company was billed more than $230,000 for the creams.

When Jayson asked his mother if she wanted to be a marketer of the creams herself, she declined because "[t]hey were making a lot of money quickly" and she didn't have a good feeling about it. R. 363, P. 5086.

Montgomery ordered creams for an acquaintance, Katie Callaway, who mentioned once in a group of friends that she had a scar from a car accident. Montgomery offered her a "free sample" of a scar cream, and she allowed him to take a picture of her insurance card. Montgomery ordered scar cream, antiaging cream, and stretch cream for her, although she did not request those medicines and had no need for them at 24 years old. She did not know the creams were prescription medications and was not contacted by a medical provider. Montgomery ordered her 12 months of automatic refills that she did not request. Later, a federal agent who was investigating the scheme

contacted Callaway, and Montgomery told her not to meet with him and tried to convince her that she had spoken with a doctor before receiving the medications.

Montgomery also targeted service members, including Zac Rice. He induced Rice to order the creams by telling him he would receive payment as part of a clinical trial, but he never received a survey to evaluate the product. Montgomery added wellness tablets to Rice's order form even though he did not request them. When confronted, Montgomery said they were "just part of the order." R. 362, P. 4601. Montgomery offered Rice commission to sell creams to other service members. Montgomery and Hindmon advised Rice to form an LLC and paid the setup cost. Because service members' family would have to pay co-pays, Montgomery instructed Rice to order the medications in the service member's name.

Rice sold creams to 23 people and was paid more than $80,000 in commissions. Some of the service members Rice sold to had agreed to order the creams because they felt they had no choice, as Rice was their superior. No medical provider had contacted them, and creams and wellness pills that they had not requested were ordered in their name. Tricare insurance paid $1,345,812 for these medically unnecessary prescriptions. Rice was discharged from the Army for his participation in the scheme.

Montgomery earned nearly $340,000 overall from the scheme.

#### E.

The government charged the five defendants with healthcare fraud, mail fraud, wire fraud, conspiracy to commit healthcare fraud, and paying and receiving illegal kickbacks. Wilkerson and Chatfield were also charged with money laundering. The parties agreed to a bench trial and did not request that the court make specific findings of fact. Before rendering a verdict, the court held a hearing to discuss the legal standards that should be applied. The court agreed to consider a good

faith defense to all charges and declined to consider fraud solely through the lens of a strict standard of fraud by omission.

After an eleven-week trial, the court found Wilkerson, Chatfield, Hindmon, and Nicholson guilty of healthcare fraud, mail and/or wire fraud, and paying and receiving illegal kickbacks. The court also found Wilkerson, Chatfield, and Hindmon guilty of conspiracy to commit healthcare fraud, and found Wilkerson and Chatfield guilty of money laundering. Montgomery was found guilty on two counts of receiving illegal kickbacks and acquitted on all other counts.

**F.**

When setting the defendants' Sentencing Guidelines ranges, the court applied enhancements for their respective roles in the scheme, number of victims, and loss caused. The court calculated loss amounts using the amount paid by insurers that was attributable to each defendant's conduct. The defendants objected to this method of calculating loss. Nicholson and Montgomery reached an agreement with the government regarding loss amount, and the court overruled the remaining objections on that issue. Ultimately, the court imposed below-Guidelines sentences for all defendants: Wilkerson was sentenced to a 165-month term of imprisonment, Chatfield to a 108-month term, Hindmon to a 51-month term, Nicholson to a 30-month term, and Montgomery to a 24-month term.

The defendants timely appealed their convictions. Wilkerson, Chatfield, and Hindmon also appealed the method used to calculate loss amounts for sentencing. The court granted the defendants bond pending appeal.

**II.**

The posture of this case means that our review is highly deferential. The parties waived a jury trial and did not request that the district court make specific findings of fact under Federal

Rule of Criminal Procedure 23(a) and (c). We therefore review the district court's verdict for sufficiency of the evidence alone, inferring from the record the "facts which are relevant to the issues here" that the trial court "could have found." *United States v. Beckley*, 335 F.2d 86, 87 (6th Cir. 1964); *United States v. Vance*, 956 F.3d 846, 853 (6th Cir. 2020) ("[I]f, from the facts found, other facts may be inferred which will support the judgment, such inferences should be deemed to have been drawn by the District Court.") (quoting *Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784, 793 (6th Cir. 1984)).

What's more, defendants seeking to overturn their convictions for insufficient evidence already face a "high bar." *United States v. Persaud*, 866 F.3d 371, 379–80 (6th Cir. 2017). Reviewing de novo, we ask if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Alebbini*, 979 F.3d 537, 543 (6th Cir. 2020) (emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In doing so, we cannot "weigh the evidence, assess the credibility of witnesses, or substitute our judgment for that of the [trier of fact]." *Id.* (alterations in original). "We must resolve all conflicts in the testimony in the government's favor and draw every reasonable inference from the evidence in favor of the government." *United States v. Bashaw*, 982 F.2d 168, 171 (6th Cir. 1992). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999) (quoting *United States v. Vannerson*, 786 F.2d 221, 225 (6th Cir. 1986)).

All five defendants challenge their convictions for sufficiency of the evidence as to the mens rea element of their offenses. They argue that they lacked criminal intent because they thought their actions were legal. Our task, then, is to determine whether, after viewing the evidence

in the light most favorable to the prosecution and accepting all reasonable inferences that would support the judgment, *any* rational factfinder could evaluate the defendants' actions and decide that they knew their actions were unlawful. Under this deferential standard, we affirm the defendants' convictions.

### III.

All defendants except Montgomery were convicted of healthcare fraud, along with mail and/or wire fraud. Healthcare fraud requires proof of three elements: "(1) the defendant knowingly and willfully executed a scheme to defraud a health-care benefit program or to obtain its money or property by fraudulent pretenses, representations, or promises; (2) the scheme related to or included a material misrepresentation or concealment of material fact; and (3) the defendant had the intent to defraud." *United States v. Sosa-Baladron*, 800 F. App'x 313, 318 (6th Cir. 2020); Sixth Circuit Pattern Jury Instruction 10.05(1).

Similarly, mail and wire fraud "each comprise three elements: first, 'that the defendant devised or willfully participated in a scheme to defraud'; second, that 'he used or caused to be used' an 'interstate wire communication' or the United States mail in furtherance of the scheme; and third, 'that he intended to deprive a victim of money or property.'" *United States v. Maddux*, 917 F.3d 437, 443 (6th Cir. 2019) (quoting *United States v. Faulkenberry*, 614 F.3d 573, 580–81 (6th Cir. 2010)).

The defendants' fraud convictions rise or fall based on whether they had intent to defraud. Fraud "is not defined according to a technical standard." *United States v. Van Dyke*, 605 F.2d 220, 225 (6th Cir. 1979); *United States v. Moore*, 29 F. App'x 222, 225 (6th Cir. 2002). Instead, fraud is measured by its departure from "moral uprightness, [ ] fundamental honesty, fair play and right dealing in the general and business life of members of society." *Van Dyke*, 605 F.2d at 225

(quoting *United States v. Bruce*, 488 F.2d 1224, 1229 (5th Cir. 1973)). Direct evidence of fraud can be scarce, so a factfinder "may consider circumstantial evidence of fraudulent intent and draw reasonable inferences therefrom." *United States v. Davis*, 490 F.3d 541, 549 (6th Cir. 2007) (quoting *United States v. Cooper*, No. 02-40069, 2004 WL 432236, at *4 (D. Kan. Feb. 10, 2004)). For example, fraudulent intent "can be inferred from efforts to conceal the unlawful activity, from misrepresentations, from proof of knowledge, and from profits." *Id.* (quoting *Cooper*, 2004 WL 432236, at *4); *United States v. Bailey*, 973 F.3d 548, 565 (6th Cir. 2020); *see, e.g.*, *United States v. Bertram*, 900 F.3d 743, 748–51 (6th Cir. 2018). Importantly, "the question of intent is generally considered to be one of fact to be resolved by the trier of the facts . . . and the determination thereof should not be lightly overturned." *United States v. White*, 492 F.3d 380, 394 (6th Cir. 2007) (quoting *United States v. Wagner*, 382 F.3d 598, 612 (6th Cir. 2004)).

At every turn, these defendants demonstrated their intent to defraud. They targeted family, friends, coworkers, and service members who had insurance that wouldn't scrutinize compound drug prescriptions; they paid customers to order the creams and pills by misrepresenting that they were part of a nonexistent clinical trial, paying direct commissions, or paying the customers' co-pays; they created pre-set order pads with drug formulas tailored to maximize profit rather than medical efficiency; they persuaded customers to order unneeded and unwanted creams; they ordered extra creams and refills for customers without their knowledge or consent; they paid medical providers to sign prescriptions without seeing patients and stamped the providers' signature without consent; they directed pharmacists to backdate prescriptions to fall within the period before insurers stopped covering compound drugs; and these drugs were excessively expensive relative to their demonstrated benefit, netting the defendants millions of dollars in just two years. A reasonable factfinder could easily conclude that these actions constitute an

intentional, comprehensive scheme to defraud and establish the defendants' guilt beyond a reasonable doubt.

The defendants try to hide behind the complexity of the healthcare system, arguing that they were "merely advertising prescriptions," and so the healthcare providers and pharmacies are responsible for any wrongdoing as gatekeepers between marketers and insurance companies. But potential wrongdoing by other parties does not excuse the defendants from the consequences of their actions here. *See, e.g.*, *United States v. Grow*, 977 F.3d 1310, 1321 (11th Cir. 2020) ("A doctor's prescription is not a get-out-of-jail-free card."); *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) ("A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."). And the evidence shows that these gatekeepers were deliberately commandeered by the marketers' scheme. The defendants co-opted the role of the healthcare provider by paying Craven to sign prescriptions without creating any doctor/patient relationship and in many cases without evaluating the patients whatsoever. In some instances, the defendants circumvented the role of the healthcare provider altogether by obtaining a stamp of Craven's signature and using it to approve prescriptions without her knowledge. The defendants also undermined the role of the pharmacy by paying a pharmacist, Jared Schwab, to consult with them to create pre-set drug formulas designed for maximum profit rather than medical efficacy and to backdate prescriptions. They did all these things knowing that the insurers of their targeted customers would cover compound drugs without preauthorization. These actions were the essence of a scheme by which the defendants intended to—and in fact did—extract massive profits from the marketing of medically unnecessary drugs. Even if these actions taken in isolation could have a plausible innocent explanation, when taken together, a reasonable factfinder could easily conclude that they establish an intentional scheme to defraud. *See United States v. Jones*, 641 F.3d

706, 710 (6th Cir. 2011); *Davis*, 490 F.3d at 547 (referring to "the paradigm health care fraud case" as one "consisting of claims for pharmaceuticals or supplies in the obvious absence of medical need").

It is true that the defendants engaged in the various actions comprising the scheme in differing degrees, and some of these actions were accomplished indirectly through downlinks. Yet there is more than sufficient evidence from which a rational trier of fact could infer that each defendant understood the essence of the scheme; that they either knew the actions their downlinks were taking or even directed the downlinks to take those actions. Seeing as the myriad of downlinks engaged in substantially similar conduct, a rational factfinder could infer that these actions were in fact part of the "process" of marketing these creams and were the essence of the scheme itself. *See Grow*, 977 F.3d at 1321 (holding that evidence of healthcare fraud was sufficient where marketers recruited people to order prescriptions and insurance was billed for pain creams, scar creams, and vitamins that were not medically necessary).

Nicholson argues that because she was not found guilty of conspiracy, that necessarily means that she wasn't part of the scheme to defraud. Not so. The crimes require proof of different elements: a person can perpetrate a scheme to defraud without being part of a conspiracy. *See, e.g.*, *United States v. Myint*, 455 F. App'x 596, 603 (6th Cir. 2012) (affirming defendant's conviction for conspiracy to commit healthcare fraud despite acquittal for substantive healthcare fraud). A court could have a myriad of reasons for not convicting on the conspiracy charge aside from lack of sufficient evidence. And on Nicholson's challenge to her fraud conviction, we ask only whether the evidence was sufficient to support a conviction on that charge.

The defendants' half-hearted assertion that they consulted attorneys does not prove that they thought their actions were legal, as they did not assert a formal advice of counsel defense and

offered no evidence of what they told their attorneys in those conversations. *United States v. Lindo*, 18 F.3d 353, 356–57 (6th Cir. 1994) (without providing evidence of full disclosure of all pertinent facts to counsel, defendant could not rely on advice of counsel defense).

In a final effort to undermine their fraud convictions, the defendants attempt to recast the evidence of affirmative misrepresentations detailed above as omissions, and then dismiss them by arguing that they had no duty to disclose. But this argument does not absolve them because a defendant can be guilty of fraud through the concealment of material information in the absence of a positive legal duty to disclose that information. *Bertram*, 900 F.3d at 748–51; *Maddux*, 917 F.3d at 443–44; *United States v. Colton*, 231 F.3d 890, 898–99 (4th Cir. 2000); *see also United States v. Keplinger*, 776 F.2d 678, 697–98 (7th Cir. 1985) ("[O]missions or concealment of material information can constitute fraud . . . without proof of a duty to disclose the information pursuant to a specific statute or regulation.") (collecting cases).

The defendants attempted to conceal the nature of their scheme from insurers. By paying a medical provider to sign the prescriptions without seeing patients, they concealed that they were the ones soliciting the cream orders rather than the prescriptions originating out of the typical doctor/patient consultation process. By creating a pre-set compound formula order form, they concealed that the formulas were created to maximize profit rather than tailored by a doctor for unique patient needs. And by fabricating a clinical trial, paying customers commissions to order creams, and paying customers' co-pays, they concealed that they were inducing customers to order creams rather than the prescriptions originating from medical necessity and consultation with a doctor. These concealments are material because insurers testified that if they knew any of this information, they would not have approved payment for the creams. But even without this concealment, the affirmative misrepresentations alone can sustain the defendants' fraud

convictions. The bottom line is that these customers would not have ordered these medically unnecessary prescription medications without the fraudulent actions of the defendants, and the defendants reaped substantial profits from convincing them to do so.

In short, there is ample evidence for a rational factfinder to infer intent to defraud.

**IV.**

Next, Wilkerson, Chatfield, and Hindmon challenge their convictions for conspiracy to commit healthcare fraud on evidence sufficiency grounds. To establish a conspiracy to commit healthcare fraud, the government must prove "(1) the existence of an agreement to violate the law; [and] (2) knowledge and intent to join the conspiracy." *Bailey*, 973 F.3d at 564–65 (quoting *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007)).

The defendants do not challenge the existence of an agreement itself or that they individually joined such an agreement. Instead, they argue only that their underlying actions were not unlawful and so they never agreed to violate the law. But, as discussed above, there is sufficient evidence for a rational factfinder to determine that the defendants engaged in a scheme by which they intended to defraud insurers. And the evidence shows that Wilkerson, Chatfield, and Hindmon were working together to carry out that scheme. They coordinated to figure out which insurers were covering the compound creams, they used the same pre-set order forms to maximize their profits, their process of recruiting customers by telling them they would be paid for participating in a clinical trial was the same, their orders were often signed by the same healthcare provider, and they were all getting paid commissions from the same source. Because their underlying scheme was intentionally fraudulent and they agreed together to accomplish that scheme, there is sufficient evidence to support the defendants' conspiracy convictions. *See United States v. Bryant*, 849 F. App'x 565, 570–71 (6th Cir. 2021).

**V.**

Wilkerson and Chatfield next challenge their money laundering convictions for sufficiency of the evidence. A person is guilty of money laundering if they "[1] knowingly engage[] or attempt[] to engage in a monetary transaction [2] in criminally derived property [3] of a value greater than $10,000 and [4] is derived from specified unlawful activity." 18 U.S.C. § 1957.

Neither defendant challenges that they knowingly derived more than $10,000 from transactions involving their drug marketing activities. The only argument they advance is, again, that their underlying conduct was not criminal. Thus, as with conspiracy, the money laundering convictions rise or fall based on the fraud convictions. *See United States v. Whitfield*, 663 F. App'x 400, 406–07 (6th Cir. 2016). Because there is sufficient evidence that Wilkerson and Chatfield intentionally defrauded insurers, there is sufficient evidence to support their convictions for money laundering.

**VI.**

Wilkerson, Chatfield, Hindmon, and Nicholson were convicted of paying and receiving illegal kickbacks, and Montgomery was convicted of receiving illegal kickbacks. Again, they challenge their convictions on sufficiency of the evidence grounds. Nicholson also argues that her kickback payment conviction and wire fraud conviction are multiplicitous.

To establish a violation of the anti-kickback statute, the government must prove that a defendant (1) knowingly and willfully offered or paid remuneration (2) to induce that person to refer an individual (3) for the furnishing of any item or service for which payment may be made under a federal healthcare program, 42 U.S.C. § 1320a-7b(b)(2), or that a defendant (1) knowingly and willfully solicited or received remuneration (2) in return for referring an individual to a person

(3) for the furnishing or arranging for the furnishing of any item or service for which payment may be made under a federal healthcare program, 42 U.S.C. § 1320a-7b(b)(1).

*Wilkerson, Chatfield, Hindmon, and Nicholson.* Here, again, the defendants argue that their conduct was not fraudulent and so they did not knowingly and willfully do something the law forbids. They assert that commission arrangements like the ones they had were standard for the industry, and so they did not believe their conduct was unlawful. Because there is sufficient evidence that Wilkerson, Chatfield, Hindmon, and Nicholson participated in a scheme with intent to defraud, the intent requirement is satisfied here as well.

*Montgomery.* More needs to be said about Montgomery, since he was not convicted of fraud. In evaluating the sufficiency of the evidence of Montgomery's convictions, we ask only whether there is sufficient evidence for a rational factfinder to find him guilty of the crimes for which he was convicted: receipt of illegal kickbacks. We do not inquire why the district court didn't find him guilty on the fraud counts. The evidence shows that Montgomery engaged in many of the same activities the court deemed fraudulent. He recruited his own downlinks by promising them commissions. He told his downlinks to offer commissions to customers to order creams. And he instructed them to say the customers were being paid as part of a clinical trial that was nonexistent. He helped pay customers' co-payments. He encouraged people to order creams they did not want or need. He also ordered creams for customers without their knowledge or consent and instructed his downlinks to do the same. According to the government, Montgomery made $338,391 from the scheme. And he set up an LLC to receive those payments. A rational factfinder could infer from those actions that he knew his conduct was unlawful, and therefore he had the requisite mens rea in that he knowingly and willfully received unlawful kickbacks. *See Bailey*, 973 F.3d at 566–67.

*Nicholson.* In addition to contesting mens rea, Nicholson argues that her convictions for receiving illegal kickbacks and wire fraud are multiplicitous. We review such claims de novo. *United States v. Vichitvongsa*, 819 F.3d 260, 273 (6th Cir. 2016). Multiplicity is "charging a single offense in more than one count in an indictment" in violation of double jeopardy. *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008) (quoting *United States v. Lemons*, 941 F.2d 309, 317 (5th Cir.1991)). To assess multiplicity, we use the test set forth in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), asking "whether each charge requires proof of a fact that the other charge does not; if each charge does, then the charges accuse different crimes and are therefore not multiplicitous." *United States v. Myers*, 854 F.3d 341, 355 (6th Cir. 2017).

The two convictions at issue here are based on a single monetary transaction—a 12/5/14 check to Matthews Consulting LLC. But the question is not whether the charges are based on the same conduct, but whether the charges each require proof of an element the other does not. A kickback violation does not require proof of using the wires; a kickback could be paid in cash, could be an exchange of goods or services in person, or could be accomplished by various other non-wire means. *See, e.g.*, *United States v. Martinez*, 921 F.3d 452, 467 (5th Cir. 2019) (kickback payment made via envelopes of cash). Meanwhile, wire fraud does not require proof that a payment was intended to induce someone to refer another person for federal healthcare services. *See, e.g.*, *United States v. Kozerski*, 969 F.3d 310, 312 (6th Cir. 2020) (wire fraud based on obtaining government contracts by impersonating a disabled veteran). So both offenses require proof of an element the other does not, and the charges are not multiplicitous. *See United States v. Tahir*, No. 15-20351, 2016 WL 795884, at *6–7 (E.D. Mich. Feb. 29, 2016).

**VII.**

Wilkerson, Chatfield, and Hindmon argue that even if their convictions are affirmed, the district court erred in calculating the loss amount for sentencing. The district court calculated loss as the total amount paid by insurers for creams sold by each defendant and their downlinks. The defendants argue that the cost of "legitimate" claims should have been subtracted from that amount.

We review de novo the district court's method of calculating loss and review any related factual findings for clear error. *United States v. Chaney*, 921 F.3d 572, 579 (6th Cir. 2019). The Guidelines instruct courts to calculate the loss amount as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). The court "does not have to 'establish the value of the loss with precision,'" *United States v. Poulsen*, 655 F.3d 492, 513 (6th Cir. 2011) (quoting *United States v. Nelson*, 356 F.3d 719, 723 (6th Cir. 2004)), but rather, "a reasonable estimate" will suffice, U.S.S.G. § 2B1.1 cmt. n. 3(C)). The loss amount need only be proven by a preponderance of the evidence. *United States v. Washington*, 715 F.3d 975, 984 (6th Cir. 2013). Because the district court is in a "unique position to assess the evidence and estimate the loss based on that evidence," the "loss determination is entitled to appropriate deference." U.S.S.G. § 2B1.1 cmt. n. 3(C).

When healthcare fraud is perpetrated against a government program, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program . . . is evidence sufficient to establish the amount of the intended loss, if not rebutted." U.S.S.G. § 2B1.1, cmt. n.3(F)(viii); *see, e.g.*, *Bryant*, 849 F. App'x at 571–72 (defendants failed to rebut loss amount because they didn't "meet their burden in providing the specific value by which the loss amount should be reduced"). In cases of fraud against private insurers as well, it is permissible for a court

to "conclude[ ] that the intended loss amount was best represented by the amount billed." *Bertram*, 900 F.3d at 752. This is especially true where "[t]he Government proved that the defendants engaged in a pervasive health care fraud conspiracy" and the defendants do not present evidence "to distinguish legitimate claims from fraudulent ones." *United States v. Lovett*, 764 F. App'x 450, 460 (6th Cir. 2019); *Bryant,* 849 F. App'x at 572; *Washington*, 715 F.3d at 985; *United States v. Mahmud*, 541 F. App'x 630, 635–36 (6th Cir. 2013). This reflects a court's "modest requirement" to make a reasonable estimate of the loss. *Bertram*, 900 F.3d at 752–53.

The defendants assert that *United States v. Mehmood* establishes that legitimate claims should be subtracted from the aggregate amount. 742 F. App'x 928, 941 (6th Cir. 2018). But that unpublished case only holds that legitimate claims should be offset "if established." *Id.* Here, the court found that the entire pervasive scheme was fraudulent by a preponderance of the evidence. Once the court made its reasonable estimate of the loss, it was up to the defendants to establish the legitimacy of the prescriptions they claim weren't fraudulent and to present the court with a valuation of those legitimate prescriptions. *See Bertram*, 900 F.3d at 752–53. But the defendants presented no contrary evidence to set apart or establish the legitimacy of any claims here, much less a valuation of such claims. Instead, they argue that the district court didn't allow them to offer such evidence, but nothing in the record indicates that the defendants were precluded from doing so, only that they chose not to. In response to the court's request for such evidence, the defendants' only contention was that there was no fraudulent scheme in the first place. Because we affirm the defendants' fraud convictions, this argument is unavailing.

## VIII.

For these reasons, we affirm the convictions and sentences of all defendants.